UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

JUSTIN UNDERWOOD                                                    PETITIONER

CIVIL ACTION NO. 3:06-CV-273-DPJ

BURL CAIN, *et al.*                                              RESPONDENTS

MEMORANDUM OPINION AND ORDER

This is a capital habeas case in which Petitioner Justin Underwood seeks leave to conduct

discovery related to a gateway actual-innocence claim.  *See* Mot. [127].  For the reasons below,

the Court grants the motion in part and denies it in part.

I.      Background

On February 16, 1994, police found the body of Virginia Harris in a wooded area

approximately a mile and a half from her home in Flora, Mississippi.  She had been shot four

times.  After a trial in the Circuit Court of Madison County, Mississippi, a jury convicted Justin

Underwood of capital murder and found that he should be sentenced to death.  The evidence

against Underwood included two statements in he which he confessed to stealing the murder

weapon and using it to kill Mrs. Harris.  Underwood's uncle had previously reported that

Underwood stole his .32-caliber revolver and that he recovered it from Underwood's car before

turning it over to police.  A ballistics expert identified it as the gun that was used to kill Mrs.

Harris.

The Mississippi Supreme Court affirmed the conviction and sentence.  *Underwood v.

State* ("*Underwood I*"), 708 So. 2d 18 (Miss. 1998).  Underwood sought post-conviction relief,

but the Mississippi Supreme Court denied his petition.  *Underwood v. State* ("*Underwood II*"),

919 So. 2d 931 (Miss. 2005).

Underwood then filed a Petition for Writ of Habeas Corpus [1] in this Court.  And while the habeas petition was pending, he filed a second petition for post-conviction relief, which the Mississippi Supreme Court denied.  *Underwood v. State* ("*Underwood III*"), 37 So. 3d 10, 11 (Miss. 2010).  Underwood eventually filed a third post-conviction petition, and this Court stayed the habeas case.  The Mississippi Supreme Court denied Underwood's third post-conviction petition, *see* En Banc Order [125-1], *Underwood v. State* ("*Underwood IV*"), No. 2015-DR-01378-SCT (Miss. Dec. 16, 2021), and this Court lifted the stay [104].

After that, Underwood filed his Motion for Discovery [108] and a Supplemental Motion for Discovery and to Amend Briefing Schedule [111] seeking discovery related to a gateway actual-innocence claim.  The Court denied those motions without prejudice after concluding that Underwood should first amend his Petition for Writ of Habeas Corpus to (1) include factual allegations supporting the actual-innocence claim, (2) identify the defaulted constitutional claims to which the actual-innocence gateway would apply, and (3) explain how factual development would resurrect those claims.  Order [120].

On March 23, 2023, Underwood filed his "Third Amended Petition for Writ of Habeas Corpus" [125], and, on April 13, 2023, he filed a Motion for Discovery [127] which the Court now addresses.

II.    Standards

Underwood seeks leave to conduct discovery to support a gateway actual-innocence claim.  "A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course."  *Bracy v. Gramley*, 520 U.S. 899, 904 (1997).  Rather, the Rules Governing Section 2254 Cases provide that a "judge may, for good cause, authorize a

party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery." Rule 6(a) of the Rules Governing 28 U.S.C. § 2254 Cases.

"A petitioner demonstrates 'good cause' under Rule 6(a) where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *United States v. Fields*, 761 F.3d 443, 478 (5th Cir. 2014). Phrased differently, good cause exists when the petitioner's allegations "establish[ ] a prima facie claim for relief." *Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000).

To justify discovery, the petitioner's factual allegations "must be specific, as opposed to merely speculative or conclusory," *id.*, and he "must provide reasons for the request," Rule 6(b) of the Rules Governing 28 U.S.C. § 2254 Cases. Rule 6 "does not authorize fishing expeditions." *Fields*, 761 F.3d at 478. But if a petitioner meets these criteria, the Court has a "duty . . . to provide the necessary facilities and procedures for an adequate inquiry." *Bracy*, 520 U.S. at 909.

Some district courts have summarized these good-cause requirements like this:

> Good cause to conduct discovery in a habeas action is based on several factors: (1) the request must be grounded on specific and demonstrable facts; (2) the request must establish a logical and direct nexus between the discovery sought and the claims pending before the court; (3) there must be real and factual evidence that the petitioner can point to in order to establish that the claims in the petition have a basis in fact and are more than mere speculation; and (4) the discovery request must be narrowly tailored to obtain specific and identifiable items.

*Albritton v. Clarke*, No. 2:16-CV-737, 2020 WL 13856950, at *1 (E.D. Va. Apr. 23, 2020) (quoting *Davis v. Humphrey*, No. 3:09-CV-222, 2010 WL 11537834, at *3 (D. Nev. Jan. 27, 2010)).

As noted, Underwood seeks discovery to show actual innocence. "The Fifth Circuit does not recognize freestanding claims of actual innocence on federal habeas review." *In re Swearingen*, 556 F.3d 344, 348 (5th Cir. 2009). Instead, an actual-innocence claim functions as a gateway through which a habeas petitioner may pursue otherwise time-barred or procedurally defaulted constitutional claims. *See McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013); *Schlup v. Delo*, 513 U.S. 298, 315 (1995).

"[A]ctual innocence is established through demonstrating that, in the light of newly-discovered evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Floyd v. Vannoy*, 894 F.3d 143, 154 (5th Cir. 2018) (quoting *Schlup*, 513 U.S. at 327). In this context, "[e]vidence does not qualify as 'new' . . . if 'it was always within the reach of [petitioner's] personal knowledge or reasonable investigation.'" *Hancock v. Davis*, 906 F.3d 387, 390 (5th Cir. 2018) (quoting *Moore v. Quarterman*, 534 F.3d 454, 465 (5th Cir. 2008)), *cert. denied*, 139 S. Ct. 2714 (2019). That means the evidence must have been "unavailable to [the petitioner] or trial counsel at or before trial." *Id.*[1] Because new evidence is "unavailable in the vast majority of cases, claims of actual innocence are rarely successful." *Schlup*, 513 U.S. at 324.

Additionally, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a

---

[1] Other circuits have held that "[f]or actual innocence purposes, 'new' evidence includes both newly discovered evidence as well as exculpatory evidence that counsel failed to discover or present at trial." *Wallace v. Mahanoy*, 2 F.4th 133, 152 (3rd Cir. 2021); *accord Gomez v. Jaimet*, 350 F.3d 673, 679–80 (7th Cir. 2003). But when "addressing whether an actual[-]innocence claim is sufficient to overcome" a procedural bar, the Fifth Circuit has "made no distinction between the treatment of ineffective[-]assistance claims and other claims." *Pedder v. Lumpkin*, 859 F. App'x 697, 697–98 (5th Cir. 2021).

factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).  The Fifth Circuit has applied this provision to gateway actual-innocence claims.  *Reed v. Stephens*, 739 F.3d 753, 772 & n.8 (5th Cir. 2014); *In re Wright*, 298 F. App'x 342, 344 (5th Cir. 2008).  And here, the Mississippi Supreme Court addressed Underwood's claim of actual innocence.  *See Underwood IV*, at 11.  Therefore, the Court presumes that any factual findings supporting the Mississippi Supreme Court's analysis were correct, and Underwood must rebut that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

In summary, to get the discovery he wants Underwood must make "specific allegations" that "show reason to believe that [he] may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief" on a gateway actual-innocence claim.  *Fields*, 761 F.3d at 478 (quoting *Bracy*, 520 U.S. at 908–09).  To succeed on an actual-innocence claim, he must demonstrate "that, in the light of newly-discovered evidence, 'it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt,'" *Floyd*, 894 F.3d at 154 (citation omitted), rebutting any factual findings the Mississippi Supreme Court previously made by clear and convincing evidence, 28 U.S.C. § 2254(e)(1).

III.    Analysis

A.     Section 2254(e)(2)

As a preliminary matter, the Court must address whether 28 U.S.C. § 2254(e)(2) applies to gateway actual-innocence claims.  Respondents argue that it does and that two recent Supreme Court decisions categorically forbid any discovery on Petitioner's actual-innocence claim.  *See* Resps.' Mem. [131] at 9 (citing *Shinn v. Ramirez*, 596 U.S. 366 (2022) and *Shoop v. Twyford*, 596 U.S. 811 (2022)).

5

AEDPA restricts this Court's ability to receive new evidence in habeas proceedings. The statute provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
>> (A) the claim relies on—
>>
>>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>>
>>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>>
>> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2). Thus, "§ 2254(e)(2) . . . generally bars evidentiary hearings in federal habeas proceedings initiated by state prisoners" except in very limited circumstances. *McQuiggin*, 569 U.S. at 395.

As Respondents note, the Supreme Court applied § 2254(e)(2) in two recent habeas cases. First, in *Shinn v. Ramirez*, the Court considered two capital habeas cases in which lower courts had allowed petitioners to develop evidence supporting *Martinez* claims. 596 U.S. at 372–73. In *Martinez v. Ryan*, the Supreme Court held:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

566 U.S. 1, 17 (2012). *Shinn* examined "whether the equitable rule announced in *Martinez* permits a federal court to dispense with § 2254(e)(2)'s narrow limits because a prisoner's state

postconviction counsel negligently failed to develop the state-court record." 596 U.S. at 371. The Court held that it did not. *Id.*

In *Shoop v. Twyford*, the Supreme Court considered whether a district court's order for the state to transport a capital habeas petitioner to a medical facility for neurological testing was "'necessary or appropriate in aid of' the federal court's resolution of the prisoner's habeas case" and therefore authorized by the All Writs Act, 28 U.S.C. § 1651(a). 596 U.S. at 814 (quoting Act). The Court noted AEDPA's limits on a federal habeas court's ability to "develop and consider new evidence." *Id.* at 819 (citing 28 U.S.C. § 2254(d); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)). Considering these restrictions, the Court concluded that the district court erred in allowing the testing because it "never determined how, in light of the limitations on its review [under AEDPA], newly developed evidence could aid [petitioner's] cause." *Id.* at 822. In other words, the petitioner failed to "explain[ ] how the results of the neurological testing could be *admissible* in his habeas proceeding, and it is hard to see how they could be." *Id.* at 823.

Both *Shinn* and *Shoop* reflect "suspicion of admitting evidence outside the state record to determine whether procedural default is excused." *Mullis v. Lumpkin*, 70 F.4th 906, 910 (5th Cir. 2023). In *Shinn*, the Supreme Court agreed with the respondents that "there is no point in developing a record for cause and prejudice if a federal court cannot later consider that evidence on the merits." 596 U.S. at 389. "Thus, if [§ 2254(e)(2)] applies and the prisoner cannot satisfy its stringent requirements, a federal court may not hold an evidentiary hearing—or otherwise consider new evidence—to assess cause and prejudice under *Martinez*." *Id.* (citation omitted). So too in *Shoop*, the Court cited *Shinn* when stating that "it serves no purpose to develop [new] evidence just to assess cause and prejudice." 596 U.S. at 823.

7

But neither case addressed a request for discovery to establish the actual-innocence gateway for considering a defaulted claim.  By its text, § 2254(e)(2) precludes new evidence "on the claim."  Broadly construed, that could preclude discovery to support a petitioner's claim that a procedural bar should not apply.  But "[h]istorically, [the Fifth Circuit] has construed 'claim' in the narrower sense . . . declin[ing] to apply AEDPA's evidentiary bar to showings that a procedural default is excused."  *Mullis*, 70 F.4th at 910.  Thus, within the Fifth Circuit, "the claim" refers only to a habeas petitioner's "underlying merits claim" rather than excuses for procedural default.  *Id.*; *see also Vineyard v. Dretke*, 125 F. App'x 551, 554 (5th Cir. 2005).

To reach that conclusion, the Fifth Circuit distinguished *Shinn* and *Shoop*.  First, "*Shinn* did not reach—and indeed expressly reserved—resolution of" whether a petitioner could use "evidence outside the state record in the *Martinez* context to establish cause and prejudice." *Mullis*, 70 F.4th at 910.  Rather, the Supreme Court merely held that "when a federal habeas court convenes an evidentiary hearing for any purpose, or otherwise admits or reviews new evidence for any purpose, it may not consider that evidence on the merits of a negligent prisoner's defaulted claim unless the exceptions in § 2254(e)(2) are satisfied."  *Shinn*, 596 U.S. at 389.  Second, although *Shoop* observed that discovery "serves no purpose . . . just to assess cause and prejudice," that language is "seemingly *dictum*."  *Mullis*, 70 F.4th at 910 (quoting *Shoop*, 596 U.S. at 823).

The Fifth Circuit also observed in *Mullis* that *Shinn* and *Shoop* were tied to the specific facts presented and it was clear that the evidentiary development was nothing more than a "Hail Mary pass" to get new evidence admitted on the merits claim.  *Id.* at 911.  Accordingly, while "the Supreme Court may, some day, extend AEDPA's evidentiary restrictions to the *Martinez* context (or, as it has suggested, dispense with *Martinez* hearings altogether)," it has not done so

8

yet.  *Id.*  "In the absence of any on-point intervening law," the Fifth Circuit declined to expand its construction of the word "claim" in § 2254(e)(2) beyond a habeas petitioner's substantive underlying merits claim.  *Id.*

Construing "claim" as the Fifth Circuit requires forecloses Respondents' argument that § 2254(e)(2) precludes the requested discovery.  Indeed, Respondents have cited no federal court decision applying *Shinn* and *Shoop* to gateway actual-innocence claims, and several federal courts have rejected identical arguments.[2]

For these reasons, the Court agrees with those other courts to address this issue.  A petitioner's "assertion of actual innocence under *Schlup* and its progeny is not a 'claim' for purposes of § 2254; rather, it is a 'gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'"  *Barbour*, 2022 WL 3570327, at *3 (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)).  Thus, "the Court is not limited to the state court record in determining whether [the petitioner] has demonstrated actual innocence under *Schlup*, and § 2254(e)(2) imposes no bar to discovery on the *Schlup* question."  *Id.*

---

[2] *See Nicholls v. Long*, No. 20-1159, 2022 WL 211617, at *5 n.6 (10th Cir. Jan. 25, 2022) ("Because, in substance, a *Schlup* claim is not a habeas claim that seeks merits relief . . . the hurdles and restrictions imposed by 28 U.S.C. § 2254(e)(2) are not applicable to a petitioner's request for an evidentiary hearing regarding a *Schlup* claim); *Sapp v. Jenkins*, No. 2:17-CV-1069, 2023 WL 1793533, at *4–*5 (S.D. Ohio Feb. 7, 2023) (finding plain language of § 2254(e)(2) shows it restricts only factual development of substantive claims for habeas relief); *Barbour v. Hamm*, No. 2:01-CV-612, 2022 WL 3570327, at *2–*4 (M.D. Ala. Aug. 18, 2022) (finding that neither *Shinn* nor *Shoop* bars evidentiary development of gateway actual-innocence claim); *Garcia Del Castillo v. Shinn*, No. CV-21-1394, 2022 WL 4073014, at *5 (D. Ariz. June 15, 2022) (deciding *Shinn* did not preclude court from considering new evidence in support of gateway actual-innocence claim); *cf. Williams v. Superintendent Mahanoy SCI*, 45 F.4th 713, 723 (3rd Cir. 2022) (observing *Shinn* "does not abrogate our holding that, generally, AEDPA's text does not forbid federal courts from developing the facts needed to excuse a procedural default").

B.      Good Cause

Underwood seeks the following discovery:

•        ballistics evidence;

•        depositions of Steve Byrd and John Michael Allen;

•        documents from the state Crime Lab;

•        deposition of Paul Griffin;

•        documentary evidence of investigatory tactics;

•        DNA and fingerprint evidence;

•        deposition of Lindsay Harris;

•        documents from the polygraph examinations of Lindsay Harris;

•        deposition of Brenda Harris and examination of her day planner;

•        documents pertaining to a life-insurance policy;

•        deposition of Judy Tucker;

•        deposition of Carroll Phelps;

•        depositions of Eddie Edwards and Christella Curtis; and

•        written discovery.

1.   Ballistics Evidence

The State's forensic expert from its Crime Lab, Steve Byrd, testified at Underwood's trial that he test-fired the .32-caliber revolver, compared those projectiles to the bullets retrieved from the victim's body, and concluded that they were "fired from . . . [Defendant's] gun." Trial Tr. [125-2] at 268–70. Underwood wants his own experts to test the evidence because he believes Byrd's methodology and conclusions were unsound.

10

To support that assertion, Underwood presents affidavits from two retained experts each of whom claims that forensic firearm identifications of the type Byrd performed are now considered inherently unreliable and that experts cannot definitively link a projectile to a specific gun.  Faigman Aff. [125-48]; Scurich Dec. [125-57].  That said, "literature would appear to support a firearms expert's ability to identify the class of gun used."  Faigman Aff. [125-48] at 3; *see also* Danas Aff. [127-4] ¶ 13(e).

Underwood now wants his ballistics expert, Gregory Danas, to re-test the evidence. Danas made "naked-eye observations" and took "basic measurements" from the firearm, the bullets removed from the victim, and the test bullets.  *Id.* ¶ 12.  But he wants to go further and conduct his own ballistics testing to compare with the State's testing.  According to him, the "results would either confirm the Crime Lab findings, not confirm the findings, or result in an inconclusive determination."  *Id.* ¶ 14.

The Mississippi Supreme Court considered this same request and made a factual finding that testing the firearm now would not constitute new evidence.  MSSC Order [108-56] at 5–6. Respondents say this factual finding is entitled to deference under § 2254(d)(2).  Resps.' Mem. [131] at 15 n.8 (citing *Rucker v. Norris*, 563 F.3d 766, 771 (8th Cir. 2009); *Byrd v. Collins*, 209 F.3d 486, 516 (6th Cir. 2000)).  Underwood did not address this point.

To obtain discovery under Rule 6, the evidence Danas might develop would have to be admissible on the actual-innocence issue.  *Cf. Shoop*, 596 U.S. at 823.  To be admissible in that context, it would have to be new, and "evidence does not qualify as 'new' . . . if it was always within the reach of [petitioner's] personal knowledge or reasonable investigation."  *Hancock*, 906 F.3d at 390 (quoting *Moore*, 534 F.3d at 465).  The Mississippi Supreme Court concluded

that Underwood could have sought this evidence before trial, and he has not rebutted that finding.

### 2.   Depositions of Byrd and Allen

Petitioner also seeks leave to depose Steve Byrd and John Michael Allen, the technician who reviewed Byrd's report, arguing that Judge Mike Mills recently "granted an identical request" in the Northern District of Mississippi.  Petr.'s Mem. [128] at 14–15 (citing *Pitchford v. Hall*, No. 4:18-CV-2-MPM, 2020 WL 12949466 (N.D. Miss. Mar. 18, 2020)).  But Byrd's challenged testimony in *Pitchford* was different, and the Court denies this request for the same reasons it denies the request to conduct additional tests.,

### 3.   Crime Lab Documents

Petitioner also wants copies of the Crime Lab's standard operating procedures, training materials, and firearms worksheets from 1993 to present.  He contends that these documents will help him demonstrate that Byrd violated the Crime Lab's operating procedures and that the Lab changed its standards over time in response to concerns about the validity of its examinations. The Court denies this request for the same reasons it denies the request for additional testing and because it is a fishing expedition.  *Fields*, 761 F.3d at 478.

### 4.   Deposition of Paul Griffin

Underwood seeks leave to depose Paul Griffin, a former Sheriff's Deputy for the Madison County Sheriff's Department.  Petitioner argues that Griffin's testimony will prove that the confession statements introduced at trial were fabricated.  The State introduced two statements from Underwood at trial.  In the first, he confessed to stealing his uncle's .32-caliber revolver.  Underwood Stmt. 1 [125-37].  In the second, he confessed to using that gun to murder Mrs. Harris.  Underwood Stmt. 2 [125-38].

Underwood says the county routinely used a "blank-form ruse," coercing suspects to sign blank forms to which officers would later add confessions. Petr.'s Mem. [128] at 16–17. He also claims to have "maintained since 1994 that he signed a blank form on which police later wrote a confession." *Id.* at 1; *see also id.* at 16. He supports that contention with out-of-court statements he made to others, including his mother. M. Underwood Aff. [125-138] ¶ 14; Lott Notes [125-62] at 10.

There are two problems with this argument. First, Underwood first asserted the blank-form argument in his third petition for post-conviction relief, and the Mississippi Supreme Court rejected it. *See* MSSC Order [125-1] at 8. That court found Underwood's argument "contrary to his previous positions taken at the suppression hearing, in the direct appeal, and in the initial petition for post-conviction relief. Before now, Underwood never claimed that both statements were fabricated from blank pages that he had signed." *Id.*

The record supports that conclusion. Underwood's motion to suppress the statements from trial never suggested that he signed a blank form; to the contrary, he said that "[t]hose statements . . . were the result of persistent and repeated interrogations by skillful law[-]enforcement officers and in the absence of counsel and without an intelligent or knowing waiver of counsel." Mot. [125-65] at 1. The transcript from the suppression hearing is a little vague but generally tracks those arguments without saying Underwood signed a blank form. *See* Suppression Hg. Tr. [125-66]. He then said the same thing on direct appeal, arguing that the statements were coerced, not that he signed a blank form. Appeal Br. [60-11] at 19–21.

His first and second motions for post-conviction relief offered nothing new. In the first, he argued that his attorney was ineffective for not calling him as a witness at the suppression hearing to show that he requested counsel before making the statements. *Underwood II*, 919 So.

2d at 940.  He did not argue that he should have been called to testify that the form was blank.

The second post-conviction petition raised *Brady* issues.  *See Underwood III*, 37 So. 3d at 11.  If

Underwood really signed a blank form, then he knew that in 1994 and could have investigated it

then.  The evidence is not new.

Second, the witness Underwood hopes to depose has already provided two affidavits that

undercut this argument.  Griffin first provided an affidavit to Underwood describing "bully-type

police tactics" employed by the Madison County Sheriff's Department during the period of

Petitioner's arrest.  Griffin Aff. 1 [125-67] ¶ 7.  Among these tactics, Griffin claims that officers

would "giv[e] suspects blank forms to sign and then later typ[e] in the information without the

suspect knowing what they were signing such as statements, consents to search, and waivers of

rights."  *Id*.  But he specifically stated that he had no knowledge of officers "performing such a

tactic in Mr. Underwood's case."  *Id.* ¶ 8.

Griffin clarified this testimony in a second affidavit he provided to the State:  "What I

described was a practice of giving suspects standardized consent to search and waiver of rights

forms which had blanks for the name and date.  Some deputies would hand suspects those forms

to sign and the deputies would later fill in the name and date sections."  Griffin Aff. 2 [125-68]

¶ 5.  Griffin said the earlier affidavit was "inaccurate, in that I did not describe nor do I have

personal knowledge of any deputies giving suspects blank statement forms to sign so the

deputies could type up fabricated statements themselves."  *Id.*  He reiterated that he has "no

personal knowledge of" investigators on Underwood's case "ever giving a suspect a blank form

to sign and then using the form to type up a fabricated statement."  *Id.* ¶ 6.  Moreover, he stated

that Deputy Terry Barfield, one of the officers who took Underwood's statements, "was not one

of the officers whose practices I did not agree with."  *Id.* ¶ 8.  According to Griffin, when

Barfield "interviewed a suspect, he would type the statement in the room with the suspect. Rather than relying on his notes of what the suspect said, he would type out statements verbatim. It was also his practice to read the statements back to the suspects before asking them to sign." *Id.*

Also, if Griffin testified consistently with his affidavits, the testimony would not support Underwood's newfound argument that he signed a blank confession. *See Hawkins v. Cavalli*, No. C 03-3668, 2006 WL 1530123, at *1 (N.D. Cal. June 2, 2006) (finding no good cause for deposition when witness had submitted sworn declaration denying knowledge of issue). If he testified inconsistently with his affidavits, that would diminish Griffin's reliability with respect to the actual-innocence burden. *See Payne v. Bell*, 89 F. Supp. 2d 967, 974 (W.D. Tenn. 2000) (denying deposition discovery where witness's retraction made him unreliable). And if Underwood hopes to discover something else during the deposition—beyond what Griffin has already stated under oath—then that constitutes a fishing expedition. *Fields*, 761 F.3d at 478.

In short, deposing Griffin would not overcome Underwood's burden because this is not new evidence and Griffin twice denied any knowledge of improper tactics being used with Underwood. Griffin also vouched for Deputy Barfield, one of the officers who took Underwood's statements.

Underwood has not demonstrated good cause for this discovery request.

     5.   Documentary Evidence of Investigatory Tactics

Underwood wants permission to submit document requests and interrogatories regarding "illegal tactics such as those . . . employed in this case." Petr.'s Mem. [128] at 17. The Court denies this request for the same reasons it denied the request to depose Paul Griffin and because it is another fishing expedition. *Fields*, 761 F.3d at 478.

6.   DNA and Fingerprints

Underwood wants to conduct DNA testing on certain physical evidence that officers collected during their investigation, including fingernail scrapings from the victim, hair/fiber from a gum wrapper found in the victim's car, and a cigarette butt found at the victim's garage entrance.  He also alleges that officers collected fingerprints from the victim's car.  He wants the prints and DNA profile(s) checked against standard law-enforcement databases.  Petr.'s Mem. [128] at 18–19.

In *Lave v. Dretke*, the petitioner made a similar request for DNA testing of blood evidence he thought might impeach a witness's statements.  416 F.3d 372, 381 (5th Cir. 2005). But the petitioner never "indicated what specific information he anticipates DNA testing would provide and, more importantly, how that information could be used to impeach [the witness's] credibility."  *Id.*  The Fifth Circuit concluded the petitioner "failed to show how the additional discovery would resolve a specific factual dispute" and therefore considered the request to be an improper "fishing expedition based on a petitioner's conclusory allegations."  *Id.* (quoting *Rector v. Johnson*, 120 F.3d 551, 562 (5th Cir. 1996)).

Underwood goes further than the *Lave* petitioner.  According to Underwood, officers conducted neither DNA nor fingerprint testing on the physical evidence even though they identified another potential suspect named Bradford.  Bradford was an apparent panhandler and crack addict who was spotted by a sheriff's deputy while driving a white car on Cox Ferry Road away from the Harris home at approximately 10:45 a.m. on the day Mrs. Harris was murdered. Petr.'s Mem. [128] at 6 (citing Grewe Narr. [125-25]); *see also* Tucker Rpt. [125-7] at 4 (identifying Bradford vehicle).  The officer noted that Bradford looked "suspicious" and was "looking off to the north side of Cox Ferry Rd."—the direction of the murder scene—"as if he

was looking for someone or something."  Grewe Narr. [125-25].  Bradford admitted being in

Flora that day begging for money and using crack.  Tucker Rpt. [125-29].  Underwood says there

is a gap in Bradford's alibi from around 8:30 or 9:00 a.m. until 10:45 a.m. when the deputy

spotted him.  Petr.'s Mem. [128] at 6–7.

Bradford's vehicle was later described as a white 1986 Oldsmobile Cutlass.

Underwood's car has been described as a cream or yellowish 1979 Oldsmobile Cutlass.  *See*

Palmer Stmt. [125-31]; M. Underwood Aff. [125-138] ¶ 11.  And Underwood points to evidence

that another witness told police he saw a white Chevrolet Malibu or Monte Carlo (both similar to

the Cutlass) in the Harrises' driveway on the day of or day before the murder.  Barfield Narr.

[125-26].  The witness was "POSITIVE" the car was white.  *Id.*  Underwood also submits an

affidavit from another witness alleging that her deceased father told police he saw a "white man"

in Flora that morning driving Mrs. Harris's car from the Harris home toward the lake where the

murder happened.  C. Curtis Aff. [125-18] ¶ 7.  Bradford is White.  When asked, the witness

specifically denied seeing Underwood—who's Black—driving the car, though Underwood's

confession says he did.  *Id.*  Also, officers found purple fibers in the victim's car.  Lab Rpt. [125-

43].  Officers reported that Bradford was wearing navy or purple clothing that day.  Tucker Rpt.

[125-28].

Respondents never address the request to perform DNA testing or conduct a comparison

other than to say this request should be denied because

> [n]one of the DNA testing Underwood seeks can prove he is innocent.  He seeks
> DNA testing of the victim's fingernail scrapings, but no evidence presented at
> trial suggested that the victim scratched or otherwise struggled with Underwood.
> The lack of Underwood's DNA, or presence of anyone else's DNA, on those
> fingernail scrapings—twenty-eight years after the murder—cannot establish
> Underwood's innocence.  The same is true of a hair found in the victim's car and
> a cigarette butt found on her property.

Resps.' Mem. [131] at 16.

That response overstates Underwood's admittedly difficult burden at the discovery stage. As noted, "[a] petitioner demonstrates 'good cause' under Rule 6(a) 'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.'" *Fields*, 761 F.3d at 478 (citation omitted). In the actual-innocence context, that requires a showing that it "is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Floyd*, 894 F.3d at 154 (citation omitted).

Physical evidence showing Bradford or someone else near Mrs. Harris, when linked with other facts, may show that Underwood is entitled to relief. Accordingly, this portion of the motion is granted.[3]

### 7.   Deposition of Mr. Harris

Underwood originally asked to depose the victim's husband, Lindsay Harris, identifying him as an alternative suspect for the murder. This request is moot because Mr. Harris died on April 13, 2024. The motion to withdraw this portion of the discovery request [138] is granted.

### 8.   Documents Related to Polygraph

Petitioner wants to submit a written discovery request for all documentation and communications regarding the two polygraph examinations administered to Mr. Harris in connection with the murder of his wife. The officer who administered the polygraph examinations stated that both tests "were inconclusive and did not indicate deception."

---

[3] Unlike the ballistic testing, Respondents did not argue that the discovery could not lead to new evidence. Perhaps it won't be new, but that cannot be determined until the tests are run because there is no indication when matching DNA or fingerprints—if any—were collected and therefore available.

Waggoner Aff. [125-83].  Moreover, the Mississippi Supreme Court specifically found that the results of the polygraph examinations were inconclusive and "did not indicate deception on Harris's part." *Underwood III*, 37 So. 3d at 12–13.  Petitioner has not rebutted this state-court factual finding by clear and convincing evidence.  Lastly, this evidence is not new.  *Fields*, 761 F.3d at 478.

9.   Deposition of Brenda Harris and Examination of Her Day Planner

Underwood seeks leave to depose Brenda Harris, the woman Mr. Harris married after the murder.  Brenda Harris executed an affidavit in 2020 testifying that she first met Mr. Harris on April 23, 1994—approximately two months after Virginia Harris's murder.  B. Harris Aff.  [125-81] ¶ 3.  She corroborated this testimony with a picture of her day planner from 1994, in which she wrote "Introduced to Lindsay" on the date.  Harris Day Planner [125-80].  Petitioner contends that this affidavit testimony is false, citing the eyewitness testimony of a woman with Mr. Harris on the day his wife was murdered.  He wants to depose Brenda Harris and examine the day planner.

Discovery into Mrs. Harris's whereabouts before the murder would not be new.  And even if Underwood offered evidence showing that Brenda Harris altered her day planner after the trial (presumably to cover up an affair with Mr. Harris), that would not establish actual innocence.  First, there would be reasons to lie about an affair other than to cover up a murder.  Second, the evidence might at most show that Mr. Harris had a motive for killing his wife, not that Underwood didn't kill her.  *See Wright v. Vaughn*, 473 F.3d 85, 92 (3d Cir. 2006) (holding that affidavits showing nothing other than prosecution witness's possible motive for killing victim do not establish actual innocence).

19

10.     Life-Insurance Documents

Underwood wants to subpoena records from Western and Southern Life Insurance Company.  Petitioner presents evidence that on February 13, 1986—nine years before the murder—Western and Southern cancelled a deed of trust that had been executed by Lindsay Harris and Virginia Harris to an individual named H.V. Watkins and later assigned to Western and Southern.  Cancellation of Deed of Trust [127-8].  According to Underwood, this cancellation demonstrates a business relationship of some sort between the Harrises and Western and Southern, which could provide evidence of Lindsay Harris's motive to murder his wife.

The Court denies this request.  Nothing in the cancellation document leads the Court to believe that, if the Court allows Underwood to subpoena the documents, he will be able to demonstrate his entitlement to relief.  This is another fishing expedition.  *Fields*, 761 F.3d at 478.  At best, Underwood might prove that Mr. Harris had a life-insurance policy on his wife.  But that would be neither unusual nor enough to conclude that no reasonable juror would have found Underwood guilty beyond a reasonable doubt.  Underwood has not demonstrated that these facts, if fully developed, would entitle him to relief on his gateway actual-innocence claim, and he has not demonstrated good cause for this discovery request.

11.     Deposition of Judy Tucker

Underwood wants to depose Sergeant Judy Tucker, whom he describes as a central figure in the investigation.  According to Underwood, Tucker located the body, took Mr. Harris's statement the day after the murder, and coordinated with the Crime Lab during the investigation and testing of the murder weapon.  She also testified at trial concerning the investigators' confirmation of Mr. Harris's alibi and was subject to cross examination.

20

The Court denies this request.  Underwood has not sufficiently articulated what he hopes to learn or how it will entitle him to relief on his gateway actual-innocence claim.  As noted with several previous requests, this is nothing more than a fishing expedition of a witness he had the opportunity to examine under oath at trial.  *Id.*

12.     Deposition of Carroll Phelps

Underwood wants to depose former Deputy Carroll Phelps, claiming that he has knowledge that another deputy committed perjury.  Specifically, Hubert Roberts, who is now deceased, testified at trial that Underwood's uncle reported his gun missing in January, but a supplemental report written by Phelps stated that Underwood's uncle approached the police about the theft in March while they were investigating the murder.  *Compare* Trial Tr. [125-2] at 239–40, *to* Phelps Supp. Rpt. [125-88].  Underwood also wants to question Phelps about Mr. Harris's polygraph tests, the investigation into Mr. Harris as a suspect, and the circumstances surrounding Underwood's arrest and confessions.  These issues are not new, and most of the request seeks a fishing expedition.  This discovery is denied.

13.     Depositions of Eddie Edwards and Christella Curtis

Underwood wants to depose two witnesses—Eddie Edwards and Christella Curtis—to perpetuate their testimony.  Edwards was the owner of a grocery store in Flora when the murder occurred and executed an affidavit declaring that Underwood did not enter the grocery store the morning Mrs. Harris was murdered.  Edwards Aff. [125-87] ¶ 4.  That testimony contradicts a statement from Underwood's second confession stating that he stopped at the store and "bought a drink and some Pop Tarts."  Underwood Stmt. 2 [125-38], at 1.  Christella Curtis executed an affidavit impeaching Mr. Harris's alibi.  C. Curtis Aff. [125-18] ¶ 5.

The Court denies these requests.  First, the information addressed in the affidavits is not new; it "was always within the reach of . . . reasonable investigation." *Hancock*, 906 F.3d at 390 (citation omitted).  Second, "[a] petitioner demonstrates 'good cause' under Rule 6(a) where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Fields*, 761 F.3d at 478 (citation omitted).  Underwood does not seek to develop any facts; the relevant facts have already been developed, as evidenced by the affidavits attached to his motion.

14.    Written Discovery Regarding Exculpatory Evidence

Finally, Underwood seeks leave to propound four interrogatories and five document request to Respondents.  Doc. Requests [127-1]; Interrogatories [127-2].  The Court denies this request.  The written discovery relates mostly to the same discovery requests addressed above.  They are also not "narrowly tailored" and appear to be another fishing expedition.  *Fields*, 761 F.3d at 478.

III.    Conclusion

The Court has considered all arguments.  Those that were not addressed in this Order would not change the results.  For the stated reasons, the Court **grants** Petitioner's Motion for Discovery [127] to the extent he seeks testing of DNA and fingerprint evidence and comparing that evidence to evidence within applicable databases.  The motion is otherwise **denied**.  The motion to withdraw discovery requests [138] is granted.

**SO ORDERED AND ADJUDGED** this the 26th day of September, 2024.

s/ <i>Daniel P. Jordan III</i>            <br>CHIEF UNITED STATES DISTRICT JUDGE